WORK; Secretary of the Interior, et al. v. READ.

(Court of Appeals of District of Columbia. Submitted October 15, 1925. Decided December 7, 1925.)

No. 4245.

1. **Injunction** ⊜⇒75—One making forest lieu selection held entitled to injunction restraining Secretary and Commissioner from rejecting it.

One making a forest lieu selection under Act June 4, 1897, as amended by Act June 6, 1900, on showing that lands selected were public lands not within prior grants, *held* entitled to injunction restraining Secretary of the Interior and Commissioner of General Land Office from rejecting the selection or issuing patent to another.

2. **Public lands** ⊜⇒29—Relinquishment of forest lands under Lieu Land Act, and acceptance. creates contract.

Relinquishment of forest lands to the United States under Act June 4, 1897, as amended by Act June 6, 1900, and acceptance thereof by the United States, creates a contractual relation, by which entryman acquires right to select in lieu of land relinquished any public land subject to homestead entry.

3. **Public lands** ⊜⇒31—Protestant against forest lieu entry held without possessory rights.

Protestant against Forest Lieu Land entry, who went into possession after date of entry by sanction of third party, *held* without possessory rights, which could be asserted either against entryman or United States.

4. **Public lands** ⊜⇒114(3)—Scope of decision in action to determine rights under patent stated.

Decision in action by patentee against subsequent patentee under second survey *held* a complete determination of plaintiff's rights under patent, and not confined to determination of his rights to land claimed by subsequent patentee.

5. **Public lands** ⊜⇒31—First entryman making forest lieu selection acquires prior right.

In case of forest lieu selection, first entryman on lands susceptible of entry, in absence of any legal obstacle acquires a prior right, which it is not within discretion of Commissioner of General Land Office or Secretary of the Interior to ignore.

Appeal from the Supreme Court of the District of Columbia.

Suit by Henry T. Read, by J. Harrington Edwards, his attorney in fact, against Hubert Work, Secretary of the Interior, and William Spry, Commissioner of the General Land Office. Decree for plaintiff, and defendants appeal. Affirmed.

O. H. Graves, of Washington, D. C., for appellants.

C. R. Pierce, of Miami, Fla., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Appellee, Read, filed a bill in equity in the Supreme Court of the District of Columbia to restrain Hubert Work, Secretary of the Interior, and William Spry, Commissioner of the General Land Office, from rejecting or canceling plaintiff's forest lieu selection of certain lands in the state of Florida, and from issuing a patent therefor to one William H. Gleason, and requiring defendants to give full force and effect to plaintiff's selection, excluding from consideration any title alleged to be in Gleason, his heirs or assigns.

It appears that under a government survey of the land made in 1845, the plat described a fractional part of section 19, township 53 S., range 42 E. T. M. Florida, as lots 1 and 2, the east line thereof bordering on the Biscayne Bay. On April 4, 1870, Gleason made a homestead entry on said land according to the 1845 survey. Thereafter Gleason petitioned the Interior Department for a resurvey of the township in which the lands were situated. A survey was had, and report and plat filed in 1875, in which it was discovered that the fractional section 19, instead of containing 164.84 acres, as shown in lots 1 and 2, 1845 survey, contained 337.76 acres. By the 1875 survey fractional section 19 was divided into 7 lots numbered consecutively. The lands described as lots 1 and 2, 1845 survey, were divided into four lots numbered 3, 4, 6, and 7 on the plat of the 1875 survey. Thereafter a patent was issued to Gleason for the portion of the land embraced within lots 1 and 2 of the original 1845 survey, and so described in the patent, instead of describing it as lots 3, 4, 6 and 7, 1875 survey.

Lot 5, lying between original lots 1 and 2 and the bay, was subsequently patented to the state of Florida as swamp land and conveyed by the state to one White. Gleason thereafter brought an action against White, claiming title to the lands embraced within lot 5. It was adjudicated in the courts of Florida against Gleason, and affirmed by the Supreme Court of the United States in Gleason v. White, 199 U. S. 54, 25 S. Ct. 782, 50 L. Ed. 87 (special reference is made to the 1845 and 1875 plats reproduced in the decision of the court), where it was held that Gleason's title was limited to the 164.84 acres embraced in lots 1 and 2, as shown by the 1845 survey.

Plaintiff Read relinquished certain lands in a forest reserve to the United States, which relinquishment was duly accepted, and on June 19, 1920, filed a forest lieu selection under the act of June 4, 1897 (30 Stat. 36), as amended by the Act of June 6, 1900 (31 Stat. 614), for lots 1 and 2 as shown by the survey of 1875. The selection was received and entered by the register and receiver and duly identified as "Gainesville 016724." These lands lie between original lot 1, 1845 survey, and the bay, and in no way conflict with the lands patented to Gleason.

All issues of fact, since the case below went off on motion to dismiss, must be determined from the bill. It is averred in the bill that, following the decision of the Supreme Court April 29, 1905, and prior to plaintiff's lieu land entry, June 19, 1920, the entry of William H. Gleason on the plat in the local land office at Gainesville, Fla., was adjusted and changed by order of the Commissioner of the General Land Office to show that it applied only to lots 3, 4, 6, and 7, 1875 survey, which embrace the same lands originally included within lots 1 and 2 of the 1845 survey, or in words: "W. ½ N. W. ¼ and W. ½ S. W. ¼, by old survey; by new survey, lots 3, 4, 6, and 7." This was done without objection by Gleason, his heirs or assigns.

It also appears that, at the time plaintiff made his entry, all of lot 2 and the north half of lot 1 was "nonmineral, unoccupied, unimproved, unsettled upon, uncultivated, uninclosed, unposted, unused, wild, and vacant public land"; that the south half of section 1 was occupied by one Deering, having thereon fencing and improvements; that the selection made by plaintiff was not made adversely to him; and that Read conveyed to Deering all the interest which he acquired under his selection to the south half of lot 1, leaving plaintiff's selection confined to the north half of lot 1 and lot 2, 1875 survey. This comprises the land in controversy.

It further appears that at the time of plaintiff's entry, June 19, 1920, the records of both the local land office at Gainesville, Fla., and the records of the General Land Office, showed that as to lots 1 and 2, 1875 survey, there was no pending application, entry, or claim, of any kind whatsoever, either by Gleason, his heirs or assigns, or any one else. It also appears that in 1919 one Whitten, the chief protestant in this case, purchased from an alleged grantee of Gleason the north one-half of lot 1 and lot 2. Both Whitten and Deering claim to have deraigned title by mesne conveyances from Gleason.

When the matter was heard in the Land Office, notwithstanding the decisions of the courts of Florida and of the Supreme Court of the United States, confining Gleason's title to the 164.84 acres, embraced within lots 1 and 2, 1845 survey, defendants sustained the claims of Whitten and Deering, and, in order to complete the chain of title, directed that a supplemental patent be issued to Gleason for the lands in question. The present action was brought to restrain the Secretary and Commissioner from enforcing this order, and from a decree granting the injunction these officers have appealed.

[1] It is clear that plaintiff is without an adequate remedy, either in equity or at law, except through the extraordinary writ here sought. To relegate him to the courts to impress a trust upon the Gleason patent would be a fruitless procedure, since the land embraced in the Gleason patent, as determined in Gleason v. White, supra, does not include the land here in controversy.

Indeed, the United States, through defendants, are here disclaiming any title to the lands in question on the theory that they were included in the original Gleason patent. Acting on this assumption, a supplemental patent could not enlarge in any respect the original patent. It would amount to nothing more than a quitclaim of what was originally conveyed, and would furnish no better basis on which to impress a trust than does the original patent.

Nor would the issue of the supplemental patent to Gleason enlarge his domain to include these lands. It would be limited to his present title, which no one is contesting; it would furnish nothing upon which to impress a trust.

[2] When plaintiff Read relinquished his lands to the United States under the Forest Lieu Land Act, and the United States accepted the relinquishment, the United States entered into a contract with him under which he was entitled to select, in lieu of the land relinquished, any public land of the United States subject to homestead entry. The situation here presented is not different in legal significance from that under consideration by the court in Santa Fé Pac. R. R. Co. v. Fall, 259 U. S. 197, 42 S. Ct. 466, 66 L. Ed. 896, where the railroad company relinquished certain lands situated within its grant from the government, and attempted, under authority of the Act of Congress of April 28, 1904 (33 Stat. 556), to select, in lieu of the

land relinquished, other vacant public land. Considering the rights of the railway company, the court said: "The moment that lands were relinquished at the request of the Secretary a contract was made and the government was bound to convey to the Company such vacant lands within the territory as the company should select, provided only that they were of equal quality. In theory of law the obligation was immediate when the selection was made, if it complied with the condition. It is true that the Secretary had to be satisfied upon that point, but his discretion was not arbitrary; it went only to the quality of the lands."

So here the only condition imposed upon plaintiff is that the lands selected must be public lands of the United States, subject to homestead entry. If the claim of Whitten is swept aside, as it must be, and Gleason is confined to the lands originally patented to him, as he must be, the lands in question are concededly public lands of the United States, subject to homestead entry. There is nothing, therefore, left to the discretion of the Secretary.

[3] It is not contended that if the lands in question are public lands, they are not open to entry under the homestead law. Being public lands, and not included within the patent to Gleason, no discretion lies with the Secretary on this point. Nor has Whitten any rights which he can assert, either against the United States or against plaintiff. He was placed in possession of the lands, subsequent to the date of plaintiff's entry, by the sanction of another party, and he has no possessory rights which can be asserted against either plaintiff or the United States.

[4] Defendants fell into error in confining the scope of the decision in Gleason v. White, supra, to lot 5. The decision is broad enough to cover both the 1845 and the 1875 surveys and the rights of all parties thereunder. Defendants attempt to support their position by the following language of the court in the White Case: "Here we have two conflicting officials surveys and plats, and by mistake of the Land Department two patents have been issued [one to Gleason, for lots 1 and 2, 1845 survey; and one to the State of Florida for lot 5, 1875 survey], which, in a certain aspect of the surveys and plats, also conflict. It is one of those unfortunate mistakes which sometimes occur, and which necessarily throw confusion and doubt upon titles. Since it was discovered, the Land Department has wisely refused to extend the confusion by further patents un-

der the survey of 1875." A careful reading of the opinion discloses that the mistake referred to was the issuance of the Gleason patent under the survey of 1845, instead of the survey of 1875, and the refusal of the department to "extend the confusion by further patents under the survey of 1875" refers unquestionably to further patents in the way of attempting to correct the mistake made in following the 1845 survey when the Gleason patent was issued.

The court in its decision, however, leaves no ground for mistake or misapprehension as to the limits of Gleason's right and the property which he acquired. On this point the court said: "It further appears that the survey of 1875 was requested by the patentee, William H. Gleason, who stated that the survey of the entire township was entirely or almost entirely obliterated. It also appears that Gleason, when he received his patent, took title to what was substantially the west half of the northwest quarter and the west half of the southwest quarter of section 19; the east line, as shown by the plat, being almost a straight line, running north and south. It does not seem that he could have been mistaken as to the land that he was acquiring from the government, for he must have lived on it five years in order to have perfected his homestead. He could not have been ignorant of the large tract lying east of what was described in the plat of 1845 as 'lot 1.' The official plat at the time of the patent was the plat of the survey of 1875. He was chargeable as matter of law with notice of that plat. More than that, as the survey was at his instance, it is a reasonable assumption that in fact he knew what the lines of that survey and plat were. Under those circumstances, full justice is done if a patent title to lands outside his lines as shown by the plat of 1845 [in this instance lot 5, 1875 survey] is sustained, for he still is protected in the tract bounded by those lines and amounting to 164.84 acres. To give him twice that amount of land would be enabling him to profit by a mistake of the government —a mistake of which he was cognizant."

It will be observed that this decision completely defines Gleason's rights, and disposes of all further contention as to his title extending beyond the limits of lots 1 and 2, 1845 survey, or lots 3, 4, 6, and 7, 1875 survey. The balance of the land in section 19 remained government land, and it was so recognized by the Supreme Court in sustaining the patent to the state of Florida for lot 5. The status, therefore, of lots 1 and 2,

1875 survey, was settled by the Supreme Court in its decision, and no longer remains an open question.

The decree in this case does not direct the issue of a patent to plaintiff, nor does it compel defendants to part with the title to public lands. It restrains these officers from canceling plaintiff's selection on account of any order, ruling, or decision based upon any alleged title in Gleason, his heirs or assigns, and requires defendants to give full legal force and effect to plaintiff's selection, excluding from consideration in disposing thereof the alleged title in Gleason, his heirs or assigns.

Referring to the decisions of the Commissioner and Secretary, affecting the plaintiff's rights, it is averred in the bill "that, in the said decisions no defect in the compliance of plaintiffs with the applicable laws, rules, and regulations is indicated; but it is held that the department has full jurisdiction to refuse to issue patent to such prior entryman with full compliance, and has jurisdiction to give a patent thereto to another, who has no application pending."

It would seem that, in the light of these concessions, defendants should have little difficulty in disposing of this case, in view of the contractual relation arising between plaintiff and the United States from plaintiff's relinquishment and its acceptance by the government. With the exclusion of Gleason from further consideration, unless defendants are in possession of something more convincing than appears from this record as ground for the cancellation of plaintiff's prior entry, their duty to approve the entry and issue a patent to plaintiff is conclusive.

[5] In the case of a forest lieu selection, the first entryman on lands susceptible of entry, in the absence of any legal obstacle, acquires a prior right, which it is not within the discretion of the Commissioner of the General Land Office or the Secretary of the Interior to ignore. The law fixes their duty. The obligation in such a case to approve the entry and issue patent is mandatory.

In Daniels v. Wagner, 237 U. S. 547, 35 S. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40, the court had under consideration a case where Daniels sought to file a forest lieu selection under the Act of June 4, 1897, and the officers of the local land office rejected his entry and permitted subsequent entries of the land selected to be made in favor of other persons. The Secretary, while admitting the right of Daniels to make the lieu selection, held that the entries as made by the local officers should prevail. Admitting the validity and priority of Daniels' application, it was contended, as here, that it was a matter confided to the discretion of the Secretary, and therefore beyond the power of the courts to control.

The case there, as here, was before the court on demurrer to the bill, and the only question on the conceded facts left for the court to consider was the extent of the discretionary power of the Secretary. Mr. Justice White, after summarizing the position assumed by the Secretary, said: "When these conclusions are accepted, it results that the claim of discretionary power is substantially this: That in a case where under an act of Congress a right is conferred to make an application to enter public land, and a duty imposed upon the department to permit the entry, the department is authorized in its discretion to refuse to allow that to be done which is commanded to be done, and thus deprive the individual of the right which the law gives him. And it becomes moreover certain that the necessary result of this assertion is the following: That although Congress may have the power to provide for the disposition of the public domain, and fix the terms and conditions upon which the people may enjoy the right to purchase, it has not done so, since every command which it has expressed on this subject may be disregarded, and every right which it has conferred on the citizen may be taken away, by an unlimited and undefined discretion which is vested by law in the administrative officers appointed for the purpose of giving effect to the law. When the true character of the proposition is thus fixed, it becomes unnecessary to go further to demonstrate its want of foundation."

This, in our opinion, disposes of the contention that the court is without jurisdiction to extend injunctive relief. The case before us is stronger than the Daniels Case, in that not only is Read the prior and only entryman, but his selection was duly accepted, filed, and entered in the Land Office. With the elimination of Gleason and Whitten from further consideration, the duty of the Secretary, on the present record, to perform the mere ministerial act imposed by law of issuing a patent, is clear.

The decree is affirmed, with costs.